No. 31 July 25, 2013 789

IN THE SUPREME COURT OF
THE STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Adverse Party*,

*v.*

DEAN RAMIZ MacBALE,
*Defendant-Relator.*

(CC CR1100933; SC S060079)

En Banc

Original proceeding in mandamus.*

Argued and submitted June 6, 2012; resubmitted January 7, 2013.

John Henry Hingson, III, Oregon City, argued the cause and filed the brief for defendant-relator.

Michael A. Casper, Assistant Attorney General, Salem, argued the cause and filed the brief for plaintiff-adverse party. With him on the brief were John Kroger, Attorney General, and Anna Marie Joyce, Solicitor General.

Margaret Garvin, Portland, filed the brief for *amicus curiae* The National Crime Victim Law Institute. With her on the brief was Amy Liu.

BALMER, C. J.

The petition for writ of mandamus is dismissed.

_____
* On petition for writ of mandamus from an order of Clackamas County Circuit Court, Eve L. Miller, Judge.

**BALMER, C. J.**

This is an original proceeding in mandamus. The issue presented is whether the state or federal constitution requires that a hearing to determine the admissibility of a rape victim's past sexual conduct be open to the public, notwithstanding that a statute mandates that that hearing be held outside the presence of the public. Relator is the defendant in a criminal action in which he has been charged with various sex crimes. Defendant claims that the alleged victim made false allegations against him so that she can later bring a civil action against him for money damages. He seeks to offer evidence at his criminal trial that the alleged victim falsely accused men of raping her on two previous occasions and that she did so for the purpose of financial or other gain. Before his criminal trial, defendant filed a motion under OEC 412 for a hearing to determine the admissibility of evidence of the alleged victim's prior sexual conduct. He also moved to allow the public to attend that hearing. The court granted the motion for a hearing but denied the motion to make the hearing public, reasoning that OEC 412 requires the hearing to take place outside the presence of the public.

Defendant petitioned this court for a writ of mandamus directing the trial court to open the OEC 412 hearing to the public, arguing that the Oregon and United States constitutions require that hearings to determine the admissibility of evidence be conducted in public. This court issued an alternative writ. The presiding judge declined to change her ruling, and the case now is before us for decision. For the reasons set forth below, we hold that the exclusion of the public from hearings under OEC 412(4) to determine the admissibility of evidence of a sex crime victim's past sexual behavior under OEC 412(2) does not violate Article I, section 10 or 11, of the Oregon Constitution or the First or Sixth Amendment to the United States Constitution.

Under OEC 412,[1] Oregon's rape shield law, evidence of a victim's prior sexual history generally is inadmissible in a prosecution for rape or certain other sex crimes, except

---

[1] OEC 412 is codified at ORS 40.210.

to prove motive or bias, or to rebut or explain certain state's evidence, or if otherwise constitutionally required. OEC 412 provides, in part:

> "(1)   Notwithstanding any other provision of law, in a prosecution for a crime described in ORS 163.355 to 163.427, or in a prosecution for an attempt to commit one of these crimes, the following evidence is not admissible:

> "(a)   Reputation or opinion evidence of the past sexual behavior of an alleged victim of the crime or a corroborating witness; or

> "(b)   Reputation or opinion evidence presented for the purpose of showing that the manner of dress of an alleged victim of the crime incited the crime or indicated consent to the sexual acts alleged in the charge.

> "(2)   Notwithstanding any other provision of law, in a prosecution for a crime described in ORS 163.355 to 163.427, or in a prosecution for an attempt to commit one of these crimes, evidence of a victim's past sexual behavior other than reputation or opinion evidence is also not admissible, unless the evidence other than reputation or opinion evidence:

> "(a)   Is admitted in accordance with subsection (4) of this section; and

> "(b)   Is evidence that:

> "(A)   Relates to the motive or bias of the alleged victim;

> "(B)   Is necessary to rebut or explain scientific or medical evidence offered by the state; or

> "(C)   Is otherwise constitutionally required to be admitted."

In this case, defendant asserts that evidence of the alleged victim's past sexual history is necessary to prove motive. Specifically, he contends that evidence that the alleged victim previously falsely accused two other men of rape tends to prove that she is motivated by a desire to inflict pain on men with whom she has had consensual sex, that she is motivated by her pursuit of money to make false allegations of rape, and that she knows how to manufacture medical or scientific evidence to support a false rape charge.

Under OEC 412(4), a defendant who intends to introduce evidence of an alleged victim's past sexual history must move the court in writing to offer the evidence, and that motion must be accompanied by a written offer of proof. If the court concludes that the motion contains evidence that is potentially admissible under OEC 412, the court must permit the defendant to establish the admissibility of that evidence at an *in camera* hearing. OEC 412(4) provides:

"(a)   If the person accused of committing rape, sodomy or sexual abuse or attempted rape, sodomy or sexual abuse intends to offer evidence under subsection (2) or (3) of this section, the accused shall make a written motion to offer the evidence not later than 15 days before the date on which the trial in which the evidence is to be offered is scheduled to begin, except that the court may allow the motion to be made at a later date, including during trial, if the court determines either that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence or that the issue to which the evidence relates has newly arisen in the case. Any motion made under this paragraph shall be served on all other parties, and on the alleged victim through the office of the prosecutor.

"(b)   The motion described in paragraph (a) of this subsection shall be accompanied by a written offer of proof. *If the court determines that the offer of proof contains evidence described in subsection (2) or (3) of this section, the court shall order a hearing in camera to determine if the evidence is admissible.* At the hearing the parties may call witnesses, including the alleged victim, and offer relevant evidence. Notwithstanding ORS 40.030(2), if the relevancy of the evidence that the accused seeks to offer in the trial depends upon the fulfillment of a condition of fact, the court, at the hearing in camera or at a subsequent hearing in camera scheduled for the same purpose, shall accept evidence on the issue of whether the condition of fact is fulfilled and shall determine the issue.

"(c)   If the court determines on the basis of the hearing described in paragraph (b) of this subsection that the evidence the accused seeks to offer is relevant and that the probative value of the evidence outweighs the danger of unfair prejudice, the evidence shall be admissible in the trial to the extent an order made by the court specifies evidence that may be offered and areas with respect to

which a witness may be examined or cross-examined. An order admitting evidence under this subsection may be appealed by the government before trial."

(Emphasis added.)

Finally, the rule is explicit that the hearing to decide relevancy is to be conducted outside the presence of the public. OEC 412(5) provides:

"For purposes of this section:

"(a) 'In camera' means out of the presence of the public and the jury[.]"

As a preliminary matter, it is clear from the foregoing that the statutory requirement that the hearing be held outside the presence of the public is mandatory; consequently, at least as a statutory matter, the trial judge was correct to enforce that requirement in closing the hearing to the public in this case. We therefore turn to defendant's contention that OEC 412's exclusion of the public from hearings to determine the relevance of evidence is invalid because is it contrary to Article I, sections 10 and 11, of the Oregon Constitution and the First and Sixth Amendments to the United States Constitution. Consistent with our usual practice to consider state constitutional issues before federal ones, *State ex rel Juv. Dept. v. S. P.*, 346 Or 592, 606, 215 P3d 847 (2009), we begin by examining defendant's arguments that the closed hearing provision of OEC 412 violates the Oregon Constitution.

We start with the constitutional provisions themselves. Article I, section 10, of the Oregon Constitution provides:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

Article I, section 11, provides, in part:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed[.]"

Both Article I, section 10, and Article I, section 11, are original provisions of the Oregon Constitution. To determine the meaning of an original provision, this court considers its wording, the historical circumstances that led to its creation, and the case law surrounding it. *State v. Cavan*, 337 Or 433, 441, 98 P3d 381 (2004); *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). The goal of that inquiry is "to understand the wording [of the constitutional provision] in the light of the way that the wording would have been understood and used by those who created the provision *** and to apply faithfully the principles embodied in the Oregon Constitution to modern circumstances as those circumstances arise." *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 90-91, 23 P3d 333 (2001) (citations and internal quotation marks omitted).

We begin with Article I, section 10. The part of section 10 at issue in this case—the first independent clause of that provision, sometimes referred to as the "open courts" clause—provides:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay[.]"

The plain words of that clause do not confer any personal right on a litigant or on a member of the media or public. *State ex rel Oregonian Pub. Co. v. Deiz*, 289 Or 277, 282-83, 613 P2d 23 (1980). Rather, in prohibiting secret courts and requiring that justice be administered openly, that part of Article I, section 10, prescribes how government must ensure fairness in the administration of justice. *Oregonian Publishing Co. v. O'Leary*, 303 Or 297, 301-02, 736 P2d 173 (1987).

In *Doe v. Corp. of Presiding Bishop*, 352 Or 77, 280 P3d 377 (2012), this court recently applied its three-step interpretive paradigm for original constitutional provisions to the open courts clause to determine whether the press was entitled to the release of certain trial exhibits after the conclusion of a trial. In that case, the court began by examining the words of the open courts clause and noted that, in the phrase "[n]o court shall be secret, but justice shall be administered, openly[,]" the key terms are "court,"

"secret," and "openly." *Id.* at 88. The court considered those terms as the framers would have understood them and determined that the word "court" would have been understood two ways: as the institution that administers justice, including the circuit courts, and as the judges and other persons who are charged by law to administer justice. Melding the two, the court concluded that, within the meaning of the open courts provision of Article I, section 10, a "court" is "a governmental institution, composed of judges and their supporting staff, whom the law charges with the responsibility to administer justice." *Id.* at 90.

Turning to the meanings of the words "secret" and "openly," the court observed that both terms address the same concept and concluded, therefore, that they should be considered together. *Id.* The court reviewed dictionary definitions of those words contemporaneous with the adoption of the constitution and determined that

> "[t]hose definitions, considered in the context of Oregon's judicial system, confirm that Oregon's framers sought to require the courts to conduct the business of administering justice in public—that is, in a manner that permits public scrutiny of the court's work in determining legal controversies."

*Id.* Taking all of the key words together, the court stated that,

> "[w]ithout question, the first phrase of the open courts clause of Article I, section 10, focuses explicitly on the court as the institution that administers justice and prohibits that institution from concealing the administration of justice from public view. The second phrase, 'justice shall be administered, openly,' similarly mandates the publicly visible and audible administration of justice."

*Id.* at 91. Notwithstanding that view of the meaning of the open courts provision of Article I, section 10, however, the court in *Corp. of Presiding Bishop* ultimately concluded that the text furnished no clear answer to the issue presented in that case—whether, after a trial had ended, an intervenor had a right to obtain the release of trial exhibits that a jury had considered in its deliberations.

In this case, as in *Corp. of Presiding Bishop*, we also conclude that the plain words of Article I, section 10, do not resolve the question presented—whether the legislature may provide, by statute, that pretrial hearings to determine the relevance of evidence of a rape victim's past sexual behavior must be closed to the public. While it is true that an OEC 412 hearing is secret in the sense that the public is excluded, it does not follow that closing an OEC 412 hearing to the public necessarily results in "concealing the administration of justice from public view," in violation of the open courts provision as explicated in *Doe*. The defendant and his lawyers are permitted to attend the hearing, there is a record of the hearing, and the trial itself, in general, is open to the public. We also observe that the words of Article I, section 10, do not clarify whether that provision is broadly directed at the administration of "justice" for the defendant, any victims, and the public, by means of a public trial leading to a verdict, or also reflects a concern for all the discrete, and sometimes minor, judicial and administrative actions that, together, result in justice being administered in a particular case.

The historical record of the adoption of Article I, section 10, sheds little additional light on the meaning of that provision. As this court noted in *Smothers*, there is no direct record of the framers' intentions with respect to Article I, section 10. 332 Or at 114. It has no analogue in the federal constitution, and, although similar, it is not identical to the part of the Indiana Constitution from which it was derived.[2] W.C. Palmer, *The Sources of the Oregon Constitution*, 5 Or L Rev 200, 201 (1926). In *Smothers*, this court stated that the phrasing of Article I, section 10, can be traced, at least in part, to Edward Coke's commentary on Chapter 29 of the Magna Carta of 1225, which read, as translated from the Latin:

> "'No freeman shall be taken, or imprisoned, or be disseised of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any otherwise destroyed; nor will we not

---

[2] Article I, section 12, of the Indiana Constitution of 1851 provided:

"All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay."

pass upon him, nor condemn him, but by lawful judgment of his peers, or by the law of the land. We will sell to no man, we will not deny or defer to any man either justice or right.'"

*Smothers*, 332 Or at 94-95, *quoting* Edward Coke, *The Second Part of the Institutes of the Laws of England*, 45 (1797). The court observed that the dominant theme of Coke's commentary on the first sentence, quoted above, was that the law prohibited *official* acts depriving individuals of life, liberty, or property unless it was done according to the "law of the land," whereas the second sentence guaranteed the rights of persons in their *private relations* with one another. *Smothers*, 332 Or at 96. As the court stated, the common law thus evolved to protect individuals in two respects: as "a shield against arbitrary government actions involving a person's life, liberty, or property *** [and as] a guarantee to every subject that a legal remedy was available for injury to goods, land, or person by any other subject of the realm." *Id.* at 97. The court in *O'Leary* characterized those protections as "a guarantee of equal access to justice for redress of legal wrongs." 303 Or at 301 n 3. Thus, although the historical underpinning of Article I, section 10, shows an abiding concern with protecting the individual from the government's arbitrary exercise of power, its historical antecedents did not specifically proscribe secret court proceedings. *Id.*

Similarly, although the Indiana provision on which Article I, section 10, is based provides that "[a]ll courts shall be open," it does not prohibit "secret" courts or mandate the open administration of justice as the Oregon Constitution does.[3] The framers of the Oregon Constitution rephrased the Indiana provision to add those concepts. As this court stated in *Corp. of Presiding Bishop*, that suggests that the framers were "concerned with access to Oregon courts by its citizens *** and were concerned equally with combating secrecy in the administration of justice and fostering judicial accountability through public scrutiny of court proceedings." 352 Or at 93. However, that understanding of the

---

[3] Moreover, as the court explained in *O'Leary*, the word "open" in early American state constitutions may have meant merely litigant access to legal redress in the courts, and not public access to observe court proceedings. 303 Or at 301 n 3.

historical development of Article I, section 10, does not answer the questions left unresolved after examining the words of the open courts clause—whether the phrases "no court shall be secret" and "justice shall be administered, openly" necessarily mean that no part of an otherwise open trial may be closed to the public. For that reason, it does not assist us in determining whether the constitution demands that an OEC 412 hearing be open to the public. We turn, therefore, to this court's case law interpreting the open courts clause of Article I, section 10.

This court has discussed the open courts clause at length in three cases: *Deiz*, *O'Leary*, and *Corp. of Presiding Bishop*. In *Deiz*, a 13-year-old girl was in custody in connection with the drowning of a younger child. *The Oregonian*, citing a strong public interest in the case, filed a motion to be permitted to attend a hearing involving the girl, although a statute excluded the general public from hearings in juvenile cases when it appeared to the judge that "the presence of the public may embarrass a witness or party or otherwise prejudice the reception of trustworthy evidence." *Former* ORS 419.498(1) (1979), *repealed by* Or Laws 1993, ch 33, § 373. The trial court barred *The Oregonian* from the hearing and reaffirmed its intention to exclude the press from all future hearings in the case. *The Oregonian* sought a writ of mandamus, arguing that Article I, section 10, of the Oregon Constitution required hearings in the case to be open to the public. The defendant trial judge responded that juvenile hearings ought to be closed to the public, because the public has no interest in juvenile proceedings. This court rejected the judge's argument, holding that Article I, section 10, "does not recognize distinctions between various kinds of judicial proceedings; it applies to all." *Deiz*, 289 Or at 283. The court then held that the judge's order barring the public from the hearings violated Article I, section 10.

In reaching that conclusion, the court did not discuss whether the constitution would permit the trial court to close particularly sensitive parts of a juvenile hearing to the public. It did, however, specifically add that its holding should not be interpreted as guaranteeing the right of public access to all judicial proceedings:

"One obvious limitation is that jury deliberations and court conferences have been and are held in private. We are of the opinion that despite the absence of any language in Art I, § 10 expressly excluding jury deliberation from the prohibition against secret deliberations, the tradition that such proceedings be held in private was so long and so well established in 1859 that the tradition should be read into the section. * * * The same is true of conferences of collegial courts."

*Id.* at 284 (citations omitted). In a similar vein, the court also stated that the open courts clause does not stop a trial court from controlling access to the courtroom to prevent overcrowding or interference with or obstruction of court proceedings. *Id.* at 285.

In *O'Leary*, the court went further in requiring public access to court proceedings. That case involved a press challenge to a statute that required *in camera* summary hearings to determine whether a witness who had refused to testify on the ground that his or her testimony would be self-incriminating could be compelled to testify. ORS 136.617.[4] The court considered the wording of Article I, section 10, and stated that it

"is written in absolute terms; there are no explicit quali-fications to its command that justice shall be administered openly. In order to be constitutional, a proceeding must either not be secret or not 'administer justice' within the meaning of section 10."

303 Or at 302.

The court observed that the hearing under ORS 136.617 was undoubtedly "secret" within the meaning of Article I, section 10, because the statute mandated that sum-mary hearings to determine whether to compel a witness's testimony be conducted outside the presence of the public. *Id.* The court then turned to the question whether "justice" is "administered" at such a hearing. The court noted that "not

---

[4] ORS 136.617 remains in effect today and is identical in all material respects to the version of the statute that was in effect at the time that this court decided *O'Leary*. However, as discussed in the text, the court's decision in *O'Leary* inval-idated the part of the statute requiring that hearings to determine whether wit-nesses who had invoked their right against self-incrimination could be compelled to testify be conducted outside the presence of the public.

every proceeding involving the administration of justice, in the general sense of that term, need be open to the public." *Id.* at 303. Rather, the scope of section 10 is limited to *adjudications*: "To the extent that adjudications are not involved, the administration of justice is not governed by it." *Id.* at 303. Police investigations, for example, are a part of the administration of justice, but they need not be open to public scrutiny. *Id.* In addition, the court referred to its earlier observation in *Deiz* that judicial proceedings that historically were closed to the public, such as jury deliberations and collegial court conferences, may be exceptions to section 10. *Id.*

The hearing to determine whether a witness could be compelled to testify, according to the court, is not a proceeding that falls outside the scope of Article I, section 10. That is so, the court stated, because the "fundamental function of courts is to determine legal rights based upon a presentation of evidence and argument," and, the court reasoned, that is what happened in hearings under ORS 136.617. *Id.* at 303. Thus, "[t]he reasons for opening trials to public scrutiny would appear to be equally applicable to an ORS 136.617 hearing." *Id.* at 303. The court rejected the contention that limiting public access to the hearing is permissible because the public is interested only in admissible evidence: "[T]he importance of visibility in the administration of justice goes far beyond the presentation of admissible evidence at trial." *Id.* at 304. Quoting from Justice Linde's concurring opinion in *Deiz*, the court stated that open justice "'serves to assure accountability for the charge not prosecuted, the reduced plea accepted, the evidence used or not used.'" *O'Leary*, 303 Or at 304 (quoting *Deiz*, 289 Or at 289 (Linde, J., concurring)). The court concluded, "There is nothing in section 10 or this court's prior decisions to suggest that public access should be limited to the presentation of admissible evidence." *Id.*, 303 Or at 304.

Finally, the court took the Court of Appeals to task for balancing the witness's "secrecy" interest in not disclosing confidential information against the command in Article I, section 10, that justice must be administered openly. The court held,

"[a]ny secrecy interest the witness may have in not disclosing incriminating information is not of a constitutional dimension. The right against self incrimination has nothing to do with secrecy; the state can compel testimony from the witness so long as immunity or some other acceptable substitute is provided. \*\*\* If the witness has a secrecy interest at all, it must be found in the closed hearing provision of ORS 136.617 itself.

"But even assuming that the witness has a secrecy interest, it cannot limit the unqualified command of section 10 that justice shall be administered openly. The government cannot avoid a constitutional command by 'balancing' it against another of its obligations. \*\*\* In this instance, the government cannot create a secret court by pleading that it must act in secret in order to avoid infringing the witness's secrecy interest or constitutional right against self incrimination."

*Id.* at 305.

We note that *O'Leary* was decided before this court adopted its current paradigm for interpreting original constitutional provisions. Thus, the court did not scrutinize the words of Article I, section 10, or specifically consider what the framers intended by the phrase "no court shall be secret." The court simply assumed that the framers meant that clause to apply to all parts of a trial, subject to the exceptions noted in *Deiz* for collegial court conferences and jury deliberations. For that reason, the court had no trouble concluding that the hearing at issue there under ORS 136.617 was "secret" within the meaning of Article I, section 10, notwithstanding that both the defendant and his counsel were permitted to attend the hearing and that the subsequent trial itself would be fully open to the public.

Moreover, in rejecting the notion that the public is interested only in evidence actually considered by the trier of fact in arriving at a decision, the court in *O'Leary* implied that the public would have a right of access to certain proceedings that clearly are not subject to the open courts clause of Article I, section 10. That is, the court quoted with approval the passage from Justice Linde's concurring opinion in *Deiz* to the effect that the importance of visibility in the administration of justice "'serves to assure accountability

for the charge not prosecuted, the reduced plea accepted, the evidence used or not used.'" *O'Leary*, 303 Or at 304 (quoting *Deiz*, 289 Or at 289 (Linde, J., concurring)). But the court overstated the point by endorsing that view. As noted, the court in *O'Leary* earlier had stated that Article I, section 10, "is directed only at adjudications." 303 Or at 303. Both a prosecutor's decision whether to charge a person with a crime or to accept a reduced plea and a party's decision not to use certain evidence at trial may be part of the administration of justice, but neither of those is an adjudication or even an action by a court, and, in our view, neither is covered by Article I, section 10.

Finally, this court, in both *Deiz* and *O'Leary*, identified only two parts of adjudications that traditionally were closed to the public as examples of proceedings that might, for that reason, be exceptions to Article I, section 10— collegial court conferences and jury deliberations. However, the court did not suggest that those were the only aspects of adjudications that could be closed to the public, and other examples of closed proceedings existed at common law. For instance, the public traditionally did not have the right to attend pretrial hearings. *Gannett Co., Inc. v. DePasquale*, 443 US 368, 387-88, 99 S Ct 2898, 61 L Ed 2d 608 (1979) (pretrial hearings were "never characterized by the same degree of openness as were actual trials"). As the Court in *Gannett* explained, under English common law, the public had no right to attend pretrial proceedings, and at least one early English statute provided that pretrial proceedings should not be deemed an open court and that the public could therefore be excluded. *Id.* at 389 (citing Indictable Offenses Act, 11 § 12 Vict., ch 42, § 19 (1848)). Further, the Court noted that closed pretrial proceedings traditionally have been a part of the judicial landscape in this country as well. *Id.* at 390. In New York in 1850, for example, pretrial hearings could be closed to the public at the defendant's request. *Id.*

Grand jury proceedings also traditionally have been secret. *State ex rel Johnson v. Roth*, 276 Or 883, 885, 557 P2d 230 (1976) (secrecy of grand jury maintained by "long established policy"); *State v. Moran*, 15 Or 262, 273, 14 P 419

(1887) ("The policy of the law generally is that the proceedings before the grand jury are secret."). In *State v. Conger,* 319 Or 484, 878 P2d 1089 (1994), this court discussed the historical circumstances leading to the provision for grand juries in the Oregon Constitution. It noted that, during the framers' debate about whether to retain the grand jury system, "[b]enefits and drawbacks to the secrecy of grand juries were discussed as well." *Id.* at 495.

Moreover, courts historically have had discretion to control how individuals were examined regarding personal and sensitive matters and could exclude the public from the courtroom during such questioning in certain circumstances. As Matthew Deady, who served as president of the Oregon Constitutional Convention in 1857, observed,

> "[A]lthough the constitution requires justice to be 'administered openly and without purchase,' no one doubts that, *** in a certain class of cases, the general public, in the interest of public morals and decency, may be excluded from the courtroom."

*Eastman v. County of Clackamas*, 32 F 24, 32 (D Or 1887).

Thus, a more complete look at the circumstances surrounding the creation of Article I, section 10, shows that, historically, certain types of proceedings in which justice can be said to have been administered were or could be closed to the public. That suggests that the framers would not have viewed the public's right to access to courts as absolute. For those reasons, despite the court's sweeping statements in *O'Leary*, we do not read the court's decision in that case as standing for the proposition that all pretrial hearings to decide the admissibility of evidence involve adjudications and must be open to the public.

The third case of relevance is this court's recent decision in *Corp. of Presiding Bishop.* There, several former boy scouts brought sexual abuse charges against, among others, the Boy Scouts of America (BSA), and a jury returned a verdict in the plaintiffs' favor. During the trial, certain BSA documents, referred to as the "ineligible volunteer files," were admitted into evidence, subject to a protective order requiring the parties to keep the documents confidential and return them to BSA after a judgment had been entered in

the case. At the conclusion of the trial, the plaintiffs moved to vacate the protective order so that the ineligible volunteer files could be released to the public. Various members of the media moved to intervene and also asked the trial court to release those exhibits for public access. The trial court granted the plaintiffs' motion to vacate the protective order, subject to the condition that the names of the victims and those who had reported alleged abuse be redacted. The media entities then filed a mandamus action demanding release of the unredacted exhibits, asserting that the open courts clause in Article I, section 10, required their release.

This court ultimately decided that Article I, section 10, did not require the release to the public of trial exhibits that were subject to a protective order. *Corp. of Presiding Bishop*, 352 Or at 86. In reaching that conclusion, the court again was called on to interpret Article I, section 10. After reviewing the text of that provision, the historical circumstances that led to its creation, and this court's case law on the topic, the court described and summarized its statements in *Deiz* and *O'Leary* concerning the open courts clause as follows:

> "Those statements confirm that a court does not comply with Article I, section 10, by confining the public's attendance in court to only the presentation of admissible evidence. The principle of open justice entitles the public to attend and to view the other aspects of the administration of justice in a court—such as a proceeding to suppress inadmissible evidence—to ensure that the court and the parties comply with the law, and appear to do so, in an accountable manner. *** The accountability for evidence used and not used, to which Justice Linde referred in *Deiz*, is the product of the public's right to see and hear a party's efforts in court to introduce and use evidence, or decline to introduce and use evidence, and to see and hear the court's decision and response to those efforts."

*Id.* at 100. However, the court concluded, "the constitutional right to an open court does not create *** a right in every observer, at the end of a court proceeding, to obtain the release of the evidence admitted or not admitted during the proceeding." *Id.* Specifically, the court agreed that a

trial court permissibly could exercise its authority to limit the disclosure of exhibits at the close of a trial in certain circumstances, including when there is a "need to protect those who have been victims of child sexual abuse and those who have reported suspected child sexual abuse to others with authority to investigate, from embarrassment, retaliation, or other harm." *Id.* at 101.

From that review of the case law we can distill several important points. First, the cases establish that, although Article I, section 10, is written in broad terms, it does not apply to all aspects of court proceedings. Second, Article I, section 10, generally prohibits a judicial proceeding from being "secret" (closed to the public) if, in that judicial proceeding, "justice" is "administered." Justice is administered when a court determines legal rights based on the presentation of evidence and argument. Put differently, the focus of the open courts provision is on "adjudications." *O'Leary*, 303 Or at 303. Third, our case law indicates that, when justice is being administered, the public's interest in the open administration of justice generally may not be subject to an open-ended "balancing" against the secrecy interest of a particular witness in the case. Fourth, notwithstanding strong textual and case law support for the principle of open court proceedings, judges have always enjoyed broad latitude to control their courtrooms, including taking such actions as may be necessary to protect vulnerable participants in judicial proceedings, including victims, from harassment or embarrassment. Given that latitude, the right of access that Article I, section 10, secures, although broad, is not absolute.

With those principles in mind, we turn to consider whether the exclusion of the public from hearings under OEC 412 violates Article I, section 10. Neither party disputes that an OEC 412 hearing is "secret," insofar as the rule mandates that the public be excluded from such hearings. But, as we have stated, not every "secret" proceeding during a trial violates Article I, section 10. The question, rather, is whether a hearing under OEC 412 "administers justice" within the meaning of that constitutional provision.

In answering that question, we observe, first, that it is clear that an OEC 412 hearing does not result in a determination of guilt or innocence; it does not administer justice in that sense. Second, we think it is significant that the purpose of a hearing under OEC 412 is not to consider whether a witness's relevant testimony should be excluded based on the witness's assertion of immunity from testifying, but, instead, to determine whether particular evidence falls within a class of evidence that the legislature has determined is presumptively *irrelevant* and should be protected from public disclosure. That fact distinguishes this case from the hearing under ORS 136.617 involved in *O'Leary*.

As we have discussed, in *O'Leary*, the trial court was called on to determine whether a witness's relevant and otherwise admissible testimony should not be admitted at trial, because the witness asserted his constitutional privilege against compelled self-incrimination. The witness made no claim that the evidence at issue was secret, confidential, or irrelevant, but argued that he could not be compelled to testify because of his right against self-incrimination. In rejecting the state's argument that the hearing on the witness's immunity claim should have been conducted *in camera*, notwithstanding Article I, section 10, this court pointed out that the witness had no secrecy interest in the incriminating information and that his interest in not being required to testify against himself could have been protected if the state were to have granted him immunity. 303 Or at 305. For that reason, requiring the hearing under ORS 136.617 to be open to the public did not impair or affect the privilege at issue in *O'Leary*. In contrast, the evidence to be considered at an OEC 412 hearing is presumptively *irrelevant*, and the harm that the legislature intended to prevent by requiring an *in camera* hearing is not the appearance of the victim as a witness, but the "degrading and embarrassing disclosure of intimate details about [the victim's] private li[fe]." *State v. Lajoie*, 316 Or 63, 69, 849 P2d 479 (1993) (internal quotations and citations omitted). Once disclosed in a public hearing, those "intimate" personal facts, even if irrelevant to the trial, will no longer be private. The bell cannot be unrung.

In that respect, the testimony that the legislature has determined should be heard *in camera* under OEC 412 is more akin to secret or confidential information involving trade secrets or communications protected from disclosure by the lawyer-client or physician-patient privileges[5] than it is to information that may be inadmissible notwithstanding its relevance because it is hearsay or because it was obtained in violation of constitutional rights. In a hearing to determine whether testimony is inadmissible hearsay under OEC 802 or instead comes within a hearsay exception, or in a hearing to determine whether a defendant's statements to police are inadmissible because they were obtained in violation of his right to counsel and to remain silent, confidential or secret information ordinarily is not involved, and an *in camera* hearing would serve no particular interest. By contrast, when trade secrets or communications alleged to fall within the lawyer-client or physician-patient privilege are involved, hearings on the admissibility of evidence or application of a privilege raise the prospect of disclosing to the public the very information that is to be protected, thereby destroying the confidential or secret nature of the information. For that reason, proceedings involving such information sometimes are held *in camera*. *See* ORS 646.469 (permitting court to hold *in camera* hearing to preserve secrecy of alleged trade secrets); *Frease v. Glazer*, 330 Or 364, 372, 4 P3d 56 (2000) (adopting framework for determining when trial court may conduct *in camera* review to determine whether crime-fraud exception to lawyer-client privilege applies).[6]

The hearing required by OEC 412 is narrowly tailored to screen for a discrete type of evidence that the legislature deems to be presumptively irrelevant to a prosecution for certain sex crimes. As discussed, the legislature has determined that evidence of the past sexual behavior of a victim or witness is *per se* inadmissible, unless it falls within one or more of three exceptions to the ban that the legislature has established. OEC 412(2)(b)(A) - (C). It also created

---

[5] *See* OEC 503 (lawyer-client privilege); OEC 504(1) (physician-patient privilege).

[6] We express no opinion as to whether, in any particular case, an *in camera* hearing involving alleged trade secrets or an assertion of the lawyer-client or physician-patient privilege might violate Article I, section 10.

a procedure—not open to the public—to determine whether the otherwise-excluded evidence falls within one of those three narrow categories. If the court determines that it does and that the probative value of the evidence outweighs the danger of unfair prejudice, then the evidence is relevant and admissible. OEC 412(4)(c). All evidence that comes within the category that the legislature has determined should be admitted is admissible at the ensuing public trial.[7]

Closure of the hearing, therefore, operates to deprive the public of exposure only to private, *irrelevant* facts about a witness's sexual history that the legislature has determined should be excluded. Openness in that circumstance would not advance any particular public interest and, given the sensitive and personal nature of the matters raised at an OEC 412 hearing, openness could potentially further victimize an already vulnerable witness or complainant and make the "complete" administration of justice referred to in Article I, section 10, more difficult, if not impossible. Indeed, rape shield laws, such as OEC 412, were enacted to "protect victims of sexual crimes from degrading and embarrassing disclosure of intimate details about their private lives" and thus eliminate one barrier to a victim's decision "to report and assist in the prosecution of the crime." *Lajoie*, 316 Or at 69 (internal quotation marks omitted). Moreover, to the extent that the trial court determines that evidence of the victim's past sexual behavior is relevant under OEC 412, that evidence will be admitted at a public trial on the merits, even if it is embarrassing or degrading. OEC 412 was intended to protect the victim, while also ensuring that the defendant was "'able to present adequately a defense by offering relevant and probative evidence.'" *Id.* at 80 (quoting legislative history).

For those reasons, we conclude that a hearing to determine the admissibility of evidence under OEC 412 does not constitute an administration of justice for purposes of Article I, section 10, and that the legislature may provide that such a hearing be closed to the public.

---

[7] And, if the trial court errs in applying OEC 412 and excludes evidence that should have been admitted at trial, the defendant can raise that issue on appeal.

We next turn to consider whether a different result obtains under Article I, section 11. That provision guarantees a criminal defendant the right to a "public *trial* by an impartial jury." (Emphasis added.) Nothing in the text or context of Article I, section 11, suggests that the framers intended to require that a *pretrial* hearing to determine the relevance of a rape victim's past sexual history take place in public. The historical circumstances that led to the creation of Article I, section 11, and relevant case law confirm that understanding.

Article I, section 11, is derived from and is identical to Article I, section 13, of the Indiana Constitution of 1851. Palmer, 5 Or L Rev at 201. The part of Article I, section 11, with which we are concerned here is a paraphrase of the Sixth Amendment to the United States Constitution, which provides:

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed[.]"

The court explained the historical circumstances surrounding the adoption of Article I, section 11, in *State v. Osborne*, 54 Or 289, 103 P 62 (1909), the only decision in which this court has construed Article I, section 11. In that case, the defendant had been charged with assault with intent to commit rape. Before the trial, the district attorney requested a court order excluding the public from the courtroom, because, he predicted, "a good deal of dirty, vulgar language" would be used. The defendant objected, but the trial court overruled the objection and directed the sheriff to clear the courtroom. The defendant ultimately was convicted and sentenced to a term of imprisonment. On review, this court reversed. The court explained that the historical purpose of the public trial right was to protect the accused from the abuses of prosecutorial power:

> "In the early history of the law, when the accused was not permitted to say anything in his own defense, or to be represented by counsel, the public prosecutor as well as the courts, it would seem, should have fully appreciated their duties in this respect; but the flagrant abuses extant in England, as well as in this country, prior to our Revolution,

"impressed upon the founders of our national and state governments the importance of providing against them by inserting in our fundamental laws the express provision that every person charged with crime shall have a public trial. The language used for this purpose is specific, clear, and free from any possible misunderstanding."

*Id.* at 296. The court went on to explain that trials must be public to ensure that the accused person receives a fair trial. The court articulated several ways in which requiring criminal trials to be open to the public furthers that goal:

"In the first place, the mere declaration that the public shall be excluded tends to impress the jury with the enormity of the offense for which the accused is to be tried, carrying with it, to some extent at least, prejudice against the person so charged. It is not an unusual occurrence that some person in an audience attending a trial will upon hearing a narrative of the incidents connected with the crime charged recall facts to which he will call attention, and thus aid in establishing the innocence of the accused. Were the public excluded, however, such aid would not be available, and the conviction of the innocent might result. Again, the presence of friends of the accused often serves to impress the jury favorably, and to that extent, at least, counteract the prejudice usually incident to being accused of an offense which the court may think the public should not hear."

*Id.* at 296-97. Those goals pertain generally to the effect on the *jury* of excluding the public from the trial. Given that the jury itself is not present for OEC 412 hearings, those goals are not directly furthered by requiring all parts of a trial, including pretrial hearings or other hearings to determine the admissibility of evidence, to be conducted in public.

Moreover, this court never has held that the public trial right under Article I, section 11, extends beyond the trial itself to pretrial hearings to determine the admissibility of evidence. In fact, in *Osborne*, the court did not suggest or imply that Article I, section 11, requires all parts of a criminal proceeding to be public. On the contrary, even in the context of discussing the impermissibility of closing an entire trial on the merits to the public, the court stated that a court must nonetheless retain the ability to control the courtroom:

"There can be no question as to the right of a court to exercise much discretion in excluding in rare instances a part of the public, such for example, as hysterical persons, or those who may be inclined to disturb the orderly progress of the trial, or the young during a class of trials that shock the sense of decency or degrade the public morals. Also, for obvious reasons, it has been held that a trial court may regulate the indiscriminate admission of persons of a known class who might by their conduct tend to embarrass the witness, or interfere with the due and orderly progress of the trial. Extreme cases have also arisen where it has been found necessary to exclude the greater part of the spectators."

54 Or at 292.

To summarize, we conclude that the statutory requirement that OEC 412 hearings to determine the admissibility of evidence of a victim or witness's past sexual behavior be conducted outside the presence of the public does not violate Article I, section 11, of the Oregon Constitution, because Article I, section 11, pertains to the trial itself and does not require a pretrial hearing under OEC 412 to be open to the public. We also have concluded that the hearing required under OEC 412 is not an administration of justice under Article I, section 10, because the purpose of the hearing is not to determine guilt or innocence, or even to determine whether relevant evidence is admissible at trial, but to screen from disclosure sensitive but presumptively irrelevant facts related to the victim's or witness's sexual history. Consequently, the closure of OEC 412 hearings to the public does not violate the mandate in Article I, section 10, of the Oregon Constitution that "no court shall be secret, and justice shall be administered, openly[.]" In light of those conclusions, we must now consider defendant's arguments that that requirement violates the First and Sixth Amendments to the United States Constitution.[8]

To begin with, defendant's arguments under the First Amendment are unavailing. The First Amendment provides, "Congress shall make no law *** abridging the

_____

[8] The First and Sixth Amendments apply to the states through the Due Process Clause of the Fourteenth Amendment. *Presley v. Georgia*, 558 US 209, 211-12, 130 S Ct 721, 175 L Ed 2d 675 (2010).

freedom of speech, or of the press." As this court stated in *Jury Service Resource Center v. De Muniz*, 340 Or 423, 429, 134 P3d 948 (2006), the United States Supreme Court has established over the last few decades "that the First Amendment encompasses a public right to observe the workings of at least some parts of the administration of justice, particularly criminal trials." However, the rights accorded by that provision protect not the accused, but the press and other members of the public: They may be asserted only by an identified excluded individual. *Huminski v. Corsones*, 396 F3d 53, 83 (2d Cir 2005) (so holding, in context of exclusion of protestor from attending trial); *see also Globe Newspaper Co. v. Superior Court*, 457 US 596, 603, 102 S Ct 2613, 73 L Ed 2d 248 (1982) (the press and general public have right of access to criminal trials under the First Amendment). It is undisputed that defendant will be permitted to attend the hearing under OEC 412. He is not personally deprived of any constitutional right to attend, and he has not shown that he is entitled to assert any constitutional rights of third parties to attend the hearing. Defendant does not have standing to assert a First Amendment right of access to the OEC 412 hearing.

The Sixth Amendment to the United States Constitution is analogous to Oregon's Article I, section 11. The Sixth Amendment provides:

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]"

Although the text of the Sixth Amendment refers to the accused's right to a "public trial," the United States Supreme Court has held that the right to a public trial extends beyond the trial itself and encompasses some pretrial proceedings. For example, in *Presley v. Georgia*, 558 US 209, 213, 130 S Ct 721, 175 L Ed 2d 675 (2010), the Court held that the Sixth Amendment guarantees the accused the right to have *voir dire* of potential jurors conducted in public. In *Waller v. Georgia*, 467 US 39, 43, 46-47, 104 S Ct 2210, 81 L Ed 2d 31 (1984), the Court held that pretrial hearings on motions to suppress evidence must be open to the public because of the public's strong interest in issues of alleged government corruption and because the outcome of the trial is likely to hinge on the outcome of such hearings.

As the Ninth Circuit Court of Appeals summarized in *U.S. v. Waters*, 627 F3d 345, 360 (9th Cir 2010), the right to a public trial extends to those pretrial proceedings that are "an integral part of the trial" and "involve the values that the right to a public trial serves." (Internal quotation marks and citations omitted.) Those values, according to the court, are

> "'(1) to ensure a fair trial, (2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, (3) to encourage witnesses to come forward, and (4) to discourage perjury.'"

*Id*. (quoting *Peterson v. Williams*, 85 F3d 39, 43 (2d Cir 1996)).

We have no trouble concluding that those values are not implicated by OEC 412's requirement that hearings to determine the relevance of certain evidence be conducted *in camera*. First, the public's absence from an OEC 412 hearing is unlikely to prevent the defendant from receiving a fair trial. The defendant, with counsel, attends the hearing and is entitled to examine witnesses and present evidence. The hearing is narrowly focused on the relevance of information related to a victim's or witness's sexual history. The standards governing that question are circumscribed by statute, and, to the extent that that evidence is offered for a purpose authorized under the statute, it will be presented at trial, before the public. Second, excluding the public from such a narrowly focused hearing will not affect the probability of additional witnesses coming forward or encourage perjury. On the contrary, a rape victim who is examined about the details of her personal sexual background may be less likely to be forthcoming if forced to discuss the matter in open court. Moreover, unlike at a suppression hearing, public attendance at an OEC 412 hearing is not necessary to expose public corruption or police misconduct.

For those reasons, we conclude that the closed hearing provision of OEC 412 does not violate the Sixth Amendment to the United States Constitution. We have already concluded that it also does not violate either Article I, section 10 or 11, and that defendant does not have standing to assert a First Amendment right of access to an OEC 412 hearing.

The trial court was correct to order the hearing to proceed *in camera*.

The petition for writ of mandamus is dismissed.